1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF MAINE

3        _____

4    U.S. BANK TRUST, N.A.,              CIVIL ACTION

5              Plaintiff          Docket No:  2:16-617-JAW

6

7         -versus-

8                                 VOLUME II of II

9    JULIA L. JONES,

10             Defendant
     _____
11                    Transcript of Proceedings

12

13   Pursuant to notice, the above-entitled matter came on
     for **Continued Bench Trial** held before **THE HONORABLE**
14   **JOHN A. WOODCOCK, JR.,** United States District Court
     Judge, in the United States District Court, Edward T.
15   Gignoux Courthouse, 156 Federal Street, Portland,
     Maine, on the 6th day of November 2017 at 10:03 a.m. as
16   follows:

17

18   Appearances:

19   For the Plaintiff:  John A. Doonan, Esquire

20
     For the Defendant:  John D. Clifford, IV, Esquire
21                       Joshua Klein-Golden, Esquire

22

23              Lori D. Dunbar, RMR, CRR
                Official Court Reporter
24
                (Prepared from manual stenography and
25                 computer aided transcription)

<pre>
 1                    INDEX OF PROCEEDINGS

 2      Testimony:   (see below)

 3                                              Page
                     INDEX OF WITNESSES
 4
        Letycia Lopez (called by Mr. Doonan)
 5         Continued Direct Examination by Mr. Doonan    25
           Voir Dire Examination by Mr. Clifford         28
 6         Continued Direct Examination by Mr. Doonan    65
           Cross-Examination by Mr. Clifford             69
 7
                     INDEX OF EXHIBITS
 8
        Plaintiff's
 9      Exhibit No.        Description          Admitted

10         8   Judgment Figures/Loan History 11/6/17     64
           9   Military Status Report and Affidavit      69
11
        Defendant's
12      Exhibit No.

13         1   Judgment Figures/Loan History 10/13/17    36
           2   Letters Re:  Loan Transfer               63
14

15

16

17

18

19

20

21

22

23

24

25
</pre>

```
 1                    (Open court)
 2          THE COURT:  Good morning.
 3          MR. DOONAN:  Good morning, Your Honor.
 4          MR. CLIFFORD:  Good morning, Your Honor.
 5          THE COURT:  So when we last met here, as I
 6   recall, there was an Exhibit 8 that had been provided
 7   on an untimely basis to Mr. Clifford, and I think
 8   Mr. Clifford made an effort to review the information
 9   that was set forth in Plaintiff's No. 8 but was unable
10   to come to a final conclusion and needed more time, so
11   we agreed to continue the matter to today.  Are we all
12   prepared to go now, Mr. Doonan, Mr. Clifford?
13          MR. CLIFFORD:  We are, Your Honor.
14          MR. DOONAN:  Yes, Your Honor.
15          THE COURT:  Why doesn't the witness resume the
16   stand.
17          MR. DOONAN:  For the Court's information, what
18   is here on this tripod is the portion of Exhibit 8 that
19   is not the summary, this is the detail, and I have
20   attempted to lay it out in a way that it would appear
21   on a spreadsheet.  I know that the print is not large
22   enough for anyone who's not standing right next to it
23   to see, but I thought I would do this as sort of a
24   chalk or a visual aid, because looking through the
25   pages that just has in many cases no -- no real
```

1    information, this gives it some context.

2         THE COURT:  Okay.  Do you have any objection

3    to his use of that as a chalk?

4         MR. CLIFFORD:  None, Your Honor.

5         THE COURT:  Thank you.  The witness is still

6    under oath.  Mr. Doonan, are you prepared to proceed?

7         MR. DOONAN:  Yes, Your Honor.

8              CONTINUED DIRECT EXAMINATION

9    BY MR. DOONAN:

10   Q.   Referring you to the document that has been

11   marked as Exhibit 8, can you identify that document for

12   me, please?

13        THE COURT:  We probably ought to have the

14   witness identify herself just for purposes of the

15   record.

16        THE WITNESS:  Letycia Lopez from Caliber Home

17   Loans.

18        THE COURT:  Thank you, you may proceed.

19   A.   Yes, Exhibit 8 is an account summary and payment

20   history.

21   Q.   And the account summary is the first how many

22   pages?

23   A.   Five pages.

24   Q.   And then the remainder of the document is the

25   payment history?

1    A.    Yes, sir.

2    Q.    And this document is maintained by Caliber?

3    A.    Yes, sir.

4    Q.    And this document was made in the ordinary course

5    of business?

6    A.    Yes, sir.

7    Q.    And it is the business of Caliber to keep such

8    records?

9    A.    Yes, it is.

10   Q.    And these records were made contemporaneously

11   with the facts that they depict?

12   A.    Yes, sir.

13   Q.    And they were made based upon the personal

14   knowledge of the people who made the records?

15   A.    Yes, sir.

16   Q.    And a portion of these records came from a

17   previous servicer; is that correct?

18   A.    That is correct.

19   Q.    And when did Caliber start servicing this loan?

20   A.    We acquired the loan in November 15, 2014, from

21   Bank of America.

22   Q.    And at the time that this loan was acquired, what

23   sort of vetting of the numbers was done by Caliber?

24   A.    In the loan processing we verify the -- that all

25   the numbers have been transferred properly and

1    accurately.  The way that we do the loan boarding is

2    that we have the sales and acquisitions department from

3    the Bank of America sales and acquisitions department,

4    what they do is that they create a database that's

5    going to match Caliber's system and Bank of America's

6    system.  All of the information gets transferred --

7    transferred to the database, and there's multiple

8    quality control tests that are done to make sure that

9    all of the figures, all of the escrow, the total amount

10   due, all of the loss mitigation activity, that

11   everything gets transferred properly.

12           Once all of that is a hundred percent

13   accurate, then at that point it's going to be

14   transferred from the database into the Caliber's

15   system, and again, we run other testing to make sure

16   that the transfer from the database gets transferred

17   accurately.  If at any point there is something that's

18   not a hundred percent accurate, then all of that

19   information gets returned and done again until it's a

20   hundred percent accurate.

21   Q.    When you say gets returned, who does it get

22   returned to?

23   A.    It gets like pulled away from the database and

24   dumped into the database again.

25   Q.    Once it's -- once more quality control work has

1    been done on it?

2    A.    Correct.

3    Q.    And does Caliber rely upon these figures once

4    they have been verified in their day-to-day business?

5    A.    Yes, sir, they become part of our business

6    records at that time.

7    Q.    And you rely upon these records on a daily basis?

8    A.    Yes, we do.

9    Q.    And you have reviewed personally the records in

10   this particular case?

11   A.    I have.

12   Q.    And have you found them to be accurate?

13   A.    They are.

14   Q.    And is there any doubt in your mind as to the

15   trustworthiness of these documents?

16   A.    No, sir.

17        MR. DOONAN:  Your Honor, I move for the

18   admission of Exhibit No. 8.

19        THE COURT:  Any objection?

20        MR. CLIFFORD:  I object, Your Honor.  I'd like

21   to inquire, if that's possible.

22        THE COURT:  Certainly.

23              VOIR DIRE EXAMINATION

24   BY MR. CLIFFORD:

25   Q.    Ms. Lopez, how many servicers has this loan had?

1    A.    The loan began with Downeast Mortgage

2    Corporation, then it was transferred to Bank of

3    America, and then to Caliber.

4    Q.    Did Countrywide ever service this loan?

5    A.    I'm not sure if Bank of America was Countrywide

6    when it was transferred to them.

7    Q.    Did Bank of America Home Loans service this loan?

8    A.    Yes, sir.

9    Q.    And then Bank of America serviced the loan.

10   A.    Well, Bank of America serviced the loan and then

11   it got transferred to Caliber.

12   Q.    Did Seterus ever service this loan?

13   A.    I don't think so.

14   Q.    If Seterus had serviced this loan, would your

15   records reflect that?  In, for example, December of

16   2012?

17   A.    It would reflect the last name of the servicer.

18   For example, if a servicer changed names while it was

19   servicing it, let's say it serviced the loan for five

20   years and when they started servicing it was

21   Countrywide and then at the end of the five years it

22   was now Bank of America, it would reflect Bank of

23   America.

24   Q.    Seterus was never part of Bank of America?

25   A.    I'm not sure if it was.

1    Q.    These loans have account numbers on them.

2    A.    Yes, they do.

3    Q.    Are those account numbers specific to a

4    particular loan and/or a particular borrower?

5    A.    The loan number is for a specific servicer for a

6    specific borrower.

7    Q.    Okay.  So if there were a document that said that

8    Seterus acquired this particular loan from the prior

9    servicer, Bank of America, and it had the prior

10   servicer's complete number on there, would that

11   indicate to you that it's likely that Seterus did

12   acquire it from Bank of America?

13   A.    I don't -- I wouldn't be able to identify that

14   information, so I cannot say yes or no.

15   Q.    You can't identify the Bank of America loan

16   number?

17   A.    No.

18   Q.    Why is that?

19   A.    Because we don't rely on that loan number.  When

20   we acquire a loan, we give them a new loan number.

21   That's the loan number that I can identify.

22   Q.    But on this particular document that Attorney

23   Doonan has put up here on these boards, there's a line

24   for the prior servicer's number that's been blacked

25   out.

1    A.     That's correct.

2    Q.     Did you black it out?

3    A.     I did not black it out.  But I do know that there

4    is a field for prior loan number that I don't focus on.

5    I focus on our current loan number and on our figures.

6    Q.     Who blacked it out?

7    A.     The person that provided to Mr. Doonan.

8    Q.     You didn't provide these.

9    A.     I did not.

10   Q.     Who did provide it to Mr. Doonan?

11   A.     It's through a -- it's through a system.  He

12   requested the information through a system called LPS,

13   and the person assigned to that system provided to him.

14   Q.     Are you aware of what degree of accuracy that

15   unnamed person employed or investigated before

16   providing these numbers to Mr. Doonan?

17   A.     Can you repeat that question, please?

18   Q.     That was inartfully formed, I'm sorry.

19          You don't know who gave Mr. Doonan the

20   numbers.

21   A.     I don't know specifically who did.

22   Q.     And you don't know what process that person went

23   through to provide Mr. Doonan with the numbers; do you?

24   A.     Oh, no, I do know the process.

25   Q.     What was that?

1    A.    The process on pulling up a payment history, I

2    mean, I'm very familiar with that.  I pull up payment

3    histories all the time.

4    Q.    And how's it done?

5    A.    It's done through a system called LPS.

6    Q.    Which is?

7    A.    Which is the --

8    Q.    How does it work?

9    A.    I mean, we push buttons to -- to put the

10   information together.

11   Q.    So this is the result of some unnamed person

12   pushing buttons?

13   A.    That is correct.

14   Q.    You don't know what buttons that person --

15   A.    No, I do.  I pull up payment histories all the

16   time.  You want me to tell you, I mean, F9, F1, F3, I

17   mean --

18   Q.    That this particular person pulled up for this

19   document, you don't know what they pushed; do you?

20   A.    No, I do, because there's only one way to pull up

21   a payment history.

22   Q.    And it's always right?

23   A.    And that is through the system called LPS, and

24   there is no -- I mean, I don't feel that there is any

25   reason for me to doubt that it was done accurately

1    because I'm looking at it and it looks exactly the same

2    as any other payment history that I've pulled out and

3    that I've reviewed before.

4    Q.    Because it looks the same, it has columns and

5    numbers, that means -- that indicates to you it's

6    accurate?

7    A.    No, because it is not done manually, it indicates

8    to me that it's accurately.  It's not done manually.

9    It is done through a system that we use every day, and

10   it is part of our business practice to pull up payment

11   histories on a daily basis.

12   Q.    The account summary.

13   A.    Yes, sir.

14   Q.    Which is the beginning of Exhibit 8.

15   A.    Yes, sir.

16   Q.    That's a document that was prepared for

17   litigation; is that correct?

18   A.    That is correct.

19   Q.    It indicates up at the top that it's the account

20   number with the last four numbers of the Caliber loan

21   number, talks about when it's good through, and it says

22   late charge freeze date, June 17, 2015.  Do you see

23   that?

24   A.    I'm sorry, it says what?

25   Q.    Late charge freeze date, June 17, 2015.

1    A.    Yes, sir.

2    Q.    Okay.  And then if you go down to near the bottom

3    of that page it will have a total of late charges,

4    which is $1,442.70.  Do you see that?

5    A.    You might be looking at a different --

6    Q.    Different Exhibit 8?

7    A.    Different account summary.

8          THE COURT:  Just out of curiosity, the -- I

9    have two packets of information up here, and my

10   Exhibit 8 on one packet, I think the one, Mr. Doonan,

11   you probably supplied this morning, at the very top has

12   no date for late charge freeze date.

13         MR. CLIFFORD:  Oh, I haven't seen that, Your

14   Honor.

15         THE WITNESS:  Which is good as of November

16   1st -- I mean, good through November 6, 2017?

17         THE COURT:  Right.

18         THE WITNESS:  Yes, that's the one.

19         MR. CLIFFORD:  So that's a different one than

20   we worked on and was given to us the last time we were

21   here, Your Honor.

22         THE WITNESS:  It's just updated numbers.

23         THE COURT:  Why don't I ask the clerk to hand

24   over the two exhibits and you gentlemen can compare

25   them.

```
 1                    (Counsel conferred.)

 2              MR. DOONAN:  This was the one that was

 3    provided in discovery.

 4              MR. CLIFFORD:  This is the one you gave us

 5    that I have not --

 6              THE WITNESS:  What date does this show?

 7              MR. CLIFFORD:  It says that it is good through

 8    October 13, 2017, which was I believe the date of the

 9    trial.

10              MR. DOONAN:  Could I just have a moment, Your

11    Honor, to compare these documents?

12              THE COURT:  Sure.  Why don't we -- do you

13    need -- how long do you need, Mr. Doonan?  Do you want

14    to take a break?

15              MR. DOONAN:  Five minutes at the most, Your

16    Honor.

17              THE COURT:  Court will stand in recess.

18       (A recess was taken from 10:18 a.m. to 10:29 a.m.)

19    BY MR. CLIFFORD:

20    Q.   Ms. Lopez, let me show you what's been marked for

21    identification as Defendant's Exhibit No. 1.  And for

22    the record I'll represent that that is the account

23    summary that was presented to the Court the last time

24    we were here.  So it's the original Exhibit 8.  Do you

25    recognize that document?
```

1    A.    Yes, it's an account summary.

2    Q.    Okay.

3    A.    From Caliber.

4    Q.    Do you have a copy of that here with you?

5    A.    I do not.

6    Q.    You don't.  I've got one over here so you can

7    look at Defendant's 1.

8    A.    I do have an account summary but it is updated

9    for November 6, and this one is good through

10   October 13.

11   Q.    I understand.

12   A.    Okay.

13   Q.    With regard to this October 13 one.

14   A.    Yes, sir.

15   Q.    Up at the top --

16         THE COURT:  Why don't we get it into evidence.

17   Is there any objection to its admission?

18         MR. DOONAN:  No objection, Your Honor.

19         THE COURT:  Defendant's 1, the account

20   summary, is admitted.

21         MR. CLIFFORD:  Thank you, Your Honor.

22   BY MR. CLIFFORD:

23   Q.    There's a line there on Defendant's 1 that does

24   not appear on the new Plaintiff's 8 up at the top.

25   It's a line that says late charge freeze date.  Do you

1   see that on Defendant's 1?

2   A.    I do.

3   Q.    Is there a reason why that is not on the new

4   Exhibit 8?

5   A.    Yes, sir.

6   Q.    And what's that?

7   A.    We have decided per investor changes that we are

8   not going to be recovering the late charges.

9   Q.    So there's no late charge at all on that.

10  A.    That is correct, if you see the second to the

11  last it says late charges zero on the one that's dated

12  November 6, 2017.

13  Q.    Okay.  And there's been an investor change, I

14  see.

15  A.    Not an investor change, an investor change

16  policy.

17  Q.    If we go down the -- under account summary, on

18  Defendant's 1 under principal, just below principal and

19  interest there's a line that says investor, colon.  Do

20  you see it?

21  A.    Yes.

22  Q.    And it's got a number there of 20,093, correct?

23  A.    That is correct.

24  Q.    And on the new Exhibit 8 it has investor in the

25  same position and a different number.

1    A.    That is correct.

2    Q.    Why?

3    A.    That is the change in policy.

4    Q.    A change in policy as opposed to a change in the

5    investor?

6    A.    That is correct.  It's still the same investor.

7    Q.    In October Caliber was claiming that there was

8    $14,442.70 in late charges due on the loan; is that

9    correct?

10   A.    What was that amount again?

11   Q.    14,442.70.

12   A.    No, that is not correct.  It is $1,442.70.

13   Q.    I'm sorry.  14,442.70 [sic].

14   A.    Yes.

15   Q.    And that was as of October 13th, and that took

16   into consideration the late charge freeze date; is that

17   correct?

18   A.    That is correct.

19   Q.    Okay.  Is it fair to say that that number,

20   1,442.70, represents the accrued late charges for 30

21   months from the date this was last due for, which was

22   November 1, 2012, up to the freeze date?

23   A.    It would have been late charges from any payments

24   that were made after the grace period or payments that

25   weren't collected.  I cannot say it was 30 payments; I

1    don't know how many payments it was.

2    Q.    Do you have there with you Exhibit 7, Plaintiff's

3    Exhibit 7?

4    A.    Yes.

5    Q.    Okay.  And that's what purports to be a notice of

6    right to cure sent by Caliber to Julie Jones; is that

7    correct?

8    A.    That's correct.

9    Q.    Go down to where the amounts claimed due are,

10   there's a line says next payment due date, 11/1/12.  Do

11   you see that?

12   A.    Yes, sir.

13   Q.    Okay.  So there haven't been any payments made

14   since then; is that correct?  No payments made on this

15   since then.

16   A.    That is correct.

17   Q.    Okay.  So the late charges are going to start

18   accruing at least at that date; is that correct?

19   A.    If there was any payments made prior to this date

20   that were made after the grace period, then they would

21   have been charged the late fee.

22   Q.    I'll represent to you that it's 30 months between

23   November 1, 2012, and June 15, 2015 -- I think it's

24   June 15 -- June 17, excuse me, June 17, 2015.  If you

25   go down a little further, you'll see a late charges

1    number there, $432.81.  Do you see that?

2    A.    Yes, sir.

3    Q.    And that's what Caliber is saying are the late

4    charges due on this loan as of August 3rd, 2016, which

5    is the date of this letter, correct?

6    A.    Yes, sir.

7    Q.    All right.  Can you explain why on the original

8    Exhibit 8, now Defendant's 1, the total late charges

9    for what would be the exact same period of time read

10   $1,442.70 as opposed to $432.81?

11   A.    No, I cannot.  Perhaps that's why now there's

12   zero charges for late charges.

13   Q.    I'm sorry, I didn't hear what you said.

14   A.    I said -- I mean, I don't know -- I would need

15   to -- I would need to do the math and see why -- how

16   much it should be and if it's any difference, and I

17   said perhaps maybe that's why now the charges are zero.

18   Q.    Because it wasn't a hundred percent accurate?

19   A.    No, that's not what I said.

20   Q.    I can represent to you that the late charge rate

21   on this, if Defendant's Exhibit No. 1, which was

22   introduced at trial before, is accurate, is $48.09 a

23   day.

24   A.    Okay.

25   Q.    Excuse me, not a day, excuse me, a month, 30

1    months at 48.09 a day --

2            THE COURT:  A month.

3            MR. CLIFFORD:  A month, I'm sorry, excuse me,

4    Your Honor.

5            THE COURT:  All right.

6    BY MR. CLIFFORD:

7    Q.    Is $1,442.70, which is the number that shows on

8    Defendant's Exhibit 1, correct?

9    A.    Correct.

10   Q.    And that would have been a number between

11   November 1, 2012, and June 17, 2015, correct?

12   A.    Correct.

13   Q.    The notice of right to cure, what purports to be

14   the 6111 notice, would cover the same period of time,

15   November 1, 2012, to June 17, 2015, exact same period,

16   because this letter is dated after that, August 3,

17   2016.

18   A.    Right.

19   Q.    This letter from Caliber says the late charges

20   are $432.81, which is nine months, I'll represent to

21   you, and not 30.  And you don't know why.

22   A.    No, I don't know why they're only charging the

23   432 and in the account summary it's charging 1,442.70.

24   Q.    You're not able to sit here and say it's not a

25   mistake; is that correct?

1    A.    No, I mean, I have no reason to doubt that there

2    is a discrepancy.  There has to be a reason on why

3    they're only charging the 432.81, but I don't know why.

4    Q.    And would that have been something that would

5    have changed between August of 2016 and October of

6    2017?

7    A.    Well, that's -- like I mentioned earlier, as of

8    today late charges due are zero, and that's because of

9    the change in policy, so.

10   Q.    Well, I understand that part.  I'm talking about

11   why the number in August of 2016 is so much smaller

12   than the number in October of 2017 for the exact same

13   period of time.

14   A.    Right, and like I said, I really don't know why,

15   but there is no reason for me to doubt that there is a

16   discrepancy.  I just cannot explain to you today why.

17   I'm sorry about that.

18   Q.    You've gone through all of these.

19   A.    Yes.

20   Q.    Did you review this notice of default and right

21   to cure?

22   A.    Yes, I did.

23   Q.    Didn't notice the discrepancy?

24   A.    I did not.

25   Q.    A little further down in the corporate advance

1    side -- corporate advance line of that notice of

2    default and right to cure, it's Exhibit 7, it's got a

3    corporate advance balance of $2,638.32.  Do you see

4    that?

5    A.    I do.

6    Q.    What's that for?

7    A.    It does not have the breakdown here.  Corporate

8    advances are advances that Caliber does on behalf of

9    the borrower.  It can be for many things.  Of course it

10   can be escrow, but the escrow is separate in this

11   particular breakdown, but it can be also for any fines

12   that the property might have accrued or for any

13   maintenance that Caliber might have done on behalf of

14   the borrower in the property.

15   Q.    Would you take a look at the spreadsheet and see

16   if you can find anywhere on there where it shows

17   Caliber was doing maintenance on the Jones property.

18   A.    Well, it's going to be on the account summary.

19   There is a -- it can be referring to the attorney fees,

20   attorneys' costs, court costs.

21   Q.    Ms. Lopez, I will suggest to you that there are

22   no maintenance charges, but in fact what you're looking

23   at are attorneys' fees that were paid by Caliber for

24   what's called a declaratory judgment action that was

25   brought to clear up the title on the property by

1    Attorney Doonan back in 2015 and 2016.  And those fees

2    are shown in the spreadsheets and total almost exactly

3    $2,638.32.  Do you know why the declaratory judgment

4    action was brought?

5    A.    No, sir.

6    Q.    When you reviewed this case, I take it you did

7    not review the legal file that had to do with the

8    problems that Caliber and U.S. Bank had with the title

9    to its mortgage?

10   A.    I did not.

11   Q.    Are you aware of the regulations on -- or

12   conditions under which pursuant to the mortgage and the

13   note that Caliber can charge attorneys' fees?

14   A.    I don't know what those regulations are.

15   Q.    Have you reviewed the mortgage?

16   A.    I have.

17   Q.    I think that is -- it's Plaintiff's Exhibit 2.

18   Got it?

19   A.    Yes, sir.

20   Q.    If you will go to Page -- Page 7, Paragraph 9, it

21   says lender's rights to protect its rights in the

22   property.  And it sets forth three scenarios under

23   which the bank can charge attorneys' fees.  The first

24   one is that if the borrower doesn't keep in this case

25   their promises and agreements under the security

1    agreement.  Those are the fees that are being charged,

2    for example, for today.  It's a chunk of the attorneys'

3    fees that are shown on the new Exhibit 8, because when

4    the bank brings an action to foreclose a mortgage

5    because of a default of the borrower of whatever

6    nature, it can collect its attorneys' fees under Maine

7    law.  That's what that is.

8            The second says someone, including me, meaning

9    Jones, begins a legal proceeding that may significantly

10   affect lender's interest in the property or rights

11   under the security instrument.

12           Are you aware of whether or not Julie Jones or

13   any other person commenced a legal action against U.S.

14   Bank which would in any fashion affect U.S. Bank's

15   security interest in the property or its mortgage under

16   Maine law?

17   A.    I don't know.

18   Q.    I'll represent to you that so far as I know

19   there's been no such action.

20   A.    Okay.

21   Q.    And then there's C, if she abandons the property.

22   And there's no allegation she's abandoned the property.

23           It would appear, and I will suggest to you,

24   Ms. Lopez, that Caliber has charged or purports to

25   charge in its notice of default and right to cure

1    $2,638.32 for attorneys' fees that it has absolutely no

2    right to collect because what it was doing then was

3    clearing up what we call a MERS problem.  It was a bad

4    mortgage assignment that ultimately got straightened

5    out, and the order of Justice Horton is one of the

6    exhibits in this case.

7         MR. DOONAN:  I'm going to object to the

8    question.  I'm not sure there was a question there.

9         MR. CLIFFORD:  No, I was representing to her

10    what was -- what was going on.

11         MR. DOONAN:  There is no doubt, Your Honor,

12    that the debtor was in default at the time of these

13    prior legal proceedings.  That may be an issue that we

14    could brief after trial as to the applicability for

15    that amount of money, but the witness has testified

16    that she has not reviewed those legal proceedings; she

17    has not reviewed those papers; she does not have any --

18    she's not an attorney.  Clearly the mortgage speaks for

19    itself.  There is no dispute as to what the nature of

20    the prior legal proceedings were.

21         THE COURT:  Well, I guess my reaction is that

22    Mr. Clifford has a right to explore this, and the

23    reason he has a right to explore it is that you gave a

24    notice to cure default.  And in that notice to cure

25    default you told Ms. Jones that she has a total to pay

1    in order to cure the default, which is 63,290.19.   Now,

2    she may have been in default otherwise, but your notice

3    to cure included, I gather, at least Mr. Clifford is

4    presenting evidence to this effect, $2,600 that you had

5    no right to demand.   So the question then comes down to

6    the extent to which the borrower has a right to an

7    accurate notice to cure letter.   And if the amount is

8    truly, for example, just the $60,000, that's different

9    than 63.   And Ms. Jones may have been able to come up

10   with 60 but not 63.   So at the very least I -- I

11   understand your objection, but I don't think that it

12   covers the waterfront, and I'm going to let

13   Mr. Clifford proceed.

14         MR. DOONAN:   Very good, Your Honor, thank you.

15   BY MR. CLIFFORD:

16   Q.    Ms. Lopez, on Defendant's Exhibit 1 --

17   A.    Yes.

18   Q.    -- the old account summary, if you get into the

19   principal balance, escrow balance, it's the long list

20   at the end of the first page, about the middle of the

21   first page down, do you see the list I'm talking about?

22   A.    Yes.

23   Q.    Okay.   Over on the right-hand side it's got

24   principal balance, 155,409.02, the escrow balance,

25   20,000 and change, then it talks about the interest

1    calculation, 5-1/2 percent, which was the rate after

2    the HAMP mod for the period 10/1/12 through 9/1/17,

3    which was the date this -- this was as of.  Well,

4    actually it was a little later than that, but for this

5    it was that month, $42,025.11.  And then the next two

6    lines, at 5-1/2 percent for the period 9/1/17 to

7    10/1/17, a little below that it says the per diem is

8    $23.42.  Do you see that?

9    A.    Yes, sir.

10   Q.    If I multiply $23.42 times 13, for example, which

11   is the next one down, 10/1/17 to 10/15/17, I get

12   $304.46.  You get $281.01.

13   A.    Did you multiply by how many days?

14   Q.    In that case by 13 days.  But if you multiply it

15   by 12 days you still won't get 281.01.  Anything there

16   pop out at you to explain that apparent discrepancy?

17   A.    No, I mean, it should be the 23.42 times the

18   number of days.

19   Q.    Right.  The one just above it, you've got it for

20   that month, period.  You've got that set out as 712.29.

21   If you do the math it's 702.60.

22   A.    I know that the interest -- I mean, if it's a per

23   diem it's daily, obviously.  I don't know why it's not

24   matching.

25   Q.    Could it just be a mistake?

1    A.    I don't know.

2    Q.    Are there other mistakes that you're aware of?

3    A.    I don't know.

4    Q.    You notice the way these per diems are calculated

5    up here, the way that Caliber put it, the first one

6    ends at 712.29, which an odd number, correct, 29 being

7    an odd number?

8    A.    Yes.

9    Q.    And the next one down is 281.01, which is an odd

10   number, correct?

11   A.    Correct.

12   Q.    The per diem ends in an even number.  Is it

13   possible to multiply an even number by whole numbers

14   and come up with an odd number?

15   A.    I don't know.

16   Q.    I'll represent to you the answer is no.

17         On the third page of Defendant's Exhibit

18   No. 1, this is a statement of your optional fee

19   charges.  Do you see that?

20   A.    Yes.

21   Q.    For the period 11/22/2014 to 10/13/2017.

22   A.    Yes.

23   Q.    Do you note that there are 16 charges for

24   inspection exterior at $15 apiece on November 22, 2014?

25   A.    Yes, sir.

1    Q.    Did they inspect it 16 times on --

2    A.    No, sir, that's when he boarded into our system.

3    Q.    I'm sorry?

4    A.    That's when he boarded into our system.

5    Q.    So these were inspections that were done by

6    somebody other than Caliber?

7    A.    That is correct.

8    Q.    And that would have been Bank of America, Bank of

9    America Home Loans?

10   A.    The prior servicers, yes, sir.

11   Q.    Seterus?

12   A.    Whoever the prior servicers were, yes.

13   Q.    Is it possible that a prior servicer would have a

14   different per diem than Caliber after the HAMP

15   modification?

16   A.    No, it should be the same.  I mean, actually the

17   per diem is based on the unpaid balance.

18   Q.    The per diem?

19   A.    I'm sorry, no, I'm sorry.  No, the -- the -- give

20   me one second.  Can you repeat the question, please?

21   Q.    Is it possible for one servicer, after the HAMP

22   modification, one servicer to have a different per diem

23   on this loan --

24   A.    I don't know.

25   Q.    -- than Caliber?

1    A.    I don't know.

2    Q.    You don't know if it's possible or you don't know

3    that it happened or --

4    A.    I -- I don't know the answer to that question.

5    Q.    Okay.  If there is a different per diem, what

6    would that indicate to you?  If Seterus's per diem, for

7    example, is different from Caliber's, would that mean

8    anything to you?

9    A.    I -- I don't know, I'm sorry.

10   Q.    Back to Exhibit 7, that's the notice of default

11   and right to cure letter.

12   A.    Yes.

13   Q.    Do you notice that the principal and interest

14   numbers, total monthly payments due for 46 months?

15   A.    Yes, sir.

16   Q.    And then underneath that principal and interest?

17   A.    Yes, sir.

18   Q.    Both ending in odd numbers?

19   A.    Yes, sir.

20   Q.    Is there a way that this calculates out on that

21   per diem as having odd numbers at the end?

22   A.    I mean, the same question you asked earlier and I

23   answered that I didn't know, and then you made a

24   statement so --

25   Q.    Could it be a mistake?

1    A.    I mean, again, I don't have a reason to doubt

2    that this is wrong.  I just do not know an

3    explanation -- I don't have an explanation to give you.

4    Q.    On the spreadsheet, there's an item at August 10,

5    2011, it's called a principal adjustment.  It's near

6    the bottom of the page.

7              MR. DOONAN:  I'm sorry, Mr. Clifford, what

8    page are you on?

9              MR. CLIFFORD:  They aren't numbered.

10             MR. DOONAN:  What date?

11             MR. CLIFFORD:  It's the -- the date listed is

12   8/10/2011.

13             MR. DOONAN:  Thank you.

14             MR. CLIFFORD:  And it would be right over

15   towards the far left-hand side of the spreadsheet.

16   A.    Yes, sir.

17   BY MR. CLIFFORD:

18   Q.    Okay.  It says there's a principal adjustment

19   there.

20   A.    Yes, sir.

21   Q.    7,500 and change.  What's that for?

22   A.    That's due to the modification.

23   Q.    So the principal amount due was reduced?

24   A.    Yes, sir.

25   Q.    On the next page of the spreadsheet for

1    December 22, 2011, there's a late charge, which

2    apparently is being paid back.

3    A.    What date was that, I'm sorry?

4    Q.    December 22, 2011.  There are actually two of

5    them there.

6    A.    Yes, sir.

7    Q.    And it shows a negative $48.10 for a late charge.

8    Apparently being reversed.

9    A.    That is correct.

10   Q.    That late charge of $48.10 is different from the

11   late charge from the account summary that's 48.09.

12   A.    That says uncollected interest or late charge.

13   Q.    Do you know what it is?

14   A.    I do not.

15   Q.    Apparently there were a number of them as you go

16   down that column.  Do you see that?  Four or five of

17   them going down.  But you don't know what those were

18   for?

19   A.    No, sir.

20   Q.    Except that they're credits?

21   A.    Yes, sir.

22   Q.    Would you say that it's something different from

23   the late charges that are included in the account

24   summary that you provided that's now Defendant's

25   Exhibit No. 1?

1    A.    Different as in?

2    Q.    As in it's a different number by a penny?

3    A.    Yes.

4    Q.    Okay.  So that means they're not late charges?

5    A.    Like I said, it says uncollected interest or late

6    charges.

7    Q.    Further down that same page on December 20, 2012,

8    there is a credit for attorneys' fees and a credit for

9    title fees.

10   A.    What day was that, again, I'm sorry?

11   Q.    December 20, 2012.  Attorneys' fees appear to be

12   $375.

13   A.    I would need to look at it in that board, I'm

14   sorry, it's very hard --

15   Q.    I can give you this -- and it's marked with a

16   highlighter so --

17   A.    Thank you.

18   Q.    -- a little easier to find.

19   A.    Thank you so much.

20   Q.    Yes, ma'am.  Talking right down here and right

21   there.

22   A.    This credit right here?

23   Q.    Yeah, and here.

24   A.    And what was the question, I'm sorry?

25   Q.    Well, do you know what they're for, in 2012 what

1   there were attorneys' fees and title fees for?  That's

2   after the HAMP modification.

3   A.    No, I mean, other than that they are crediting

4   the account for that, yes.

5   Q.    Okay.  You don't know what they were for.

6   A.    I mean, that's right there.  For the attorney

7   trust fee and the title fee.

8   Q.    On the next page right at the bottom, 3/20/14,

9   see it?

10  A.    Yes, sir.

11  Q.    That attorney trustee's fee debit, title fees

12  debit, attorney trustee fee NB, debit, and title fees

13  NB debit, title fees INV debit.  Any idea what those

14  are for?

15  A.    I do not.

16  Q.    Okay.  On the next page for 3/21/14, the next

17  day, you've got some title fees with a credit and an

18  attorney trustee fee with a credit both marked NB.

19  A.    Yes, sir.

20  Q.    And that credits back part of what was debited

21  the day before?

22  A.    Yes, sir.

23  Q.    But not all of it.

24  A.    Yes, sir.

25  Q.    Do you know why?

1    A.    I do not.

2    Q.    Further down that same line on June 27, 2014,

3    there's a credit for attorneys' fees and title fees.

4    A.    What date was that, I'm sorry?

5    Q.    That would be 6/27/2014.  Same exact amounts of

6    money.

7    A.    Yes.

8    Q.    I take it you don't know what those were for,

9    either.

10   A.    No.

11   Q.    Down near the bottom of the page there are two

12   entries for 3/27/2015.  It says reverse transfer, loan

13   transfer with payment reversal transfer automatically

14   generated by the system.  One's 9,744.94 and then

15   there's -- the next one down is a negative 9,744.94.

16   Do you know what that is?

17   A.    These are those instances that I was explaining

18   on the loan boarding process that sometimes something

19   might not be a hundred percent accurate and it gets

20   fixed until it's a hundred percent accurate.  This is

21   one of those examples.

22   Q.    So the mistake was charging the account

23   $9,744.94?

24   A.    May I see that --

25   Q.    Sure.

1    A.    -- other one?  I'm sorry.

2    Q.    Right down here.

3    A.    Yes, that is correct.  So it's a reverse

4    transfer, so when he got -- boarding was $9,744.94 and

5    then he got reversed.

6    Q.    Do you know what or why there was a boarding in

7    March of 2015?

8    A.    I am not sure.

9    Q.    And you don't know what the 9,700 change is for?

10   A.    No.

11   Q.    On the next page, which is the last page that I

12   have of this spreadsheet, very bottom, for 10/1/2012 --

13   excuse me, 9/20/2017, there's another one of those

14   reverse transfers.  It's easier if I bring this over to

15   you.  This down here?

16   A.    Yes.

17   Q.    These two?

18   A.    Yes, same situation.

19   Q.    Same thing?

20   A.    Yes, sir.

21   Q.    What was the loan transfer going on a couple

22   months ago?

23   A.    Like I said, I don't know.  Those are just

24   adjustments that needed to be done in the payment

25   history.

1    Q.    So where it says loan transfer with a payment

2    reversal slash or payment reversal transfer

3    automatically generated, that doesn't mean there was a

4    loan transfer when this was done?

5    A.    If -- I mean, it's done the same day right

6    after -- one after the other, so it really never

7    impacted the -- the principal balance.

8    Q.    I understand that.  What I'm asking is, what was

9    the loan transfer that gave rise to this that is being

10   reported as having happened in September of this year?

11   A.    I don't know.

12   Q.    You're not aware of any loan transfer?

13   A.    No, it's not being transferred at this time, no,

14   it's not.

15   Q.    Isn't it a fact that those numbers are escrow

16   numbers that show up in transfers?

17   A.    I mean, it does match the escrow balance, but --

18   Q.    You don't know.

19   A.    I don't know because it's being wiped off when

20   you make the next transaction.

21   Q.    And escrow balances aren't wiped out just because

22   there's a servicer change.

23   A.    No.

24   Q.    Did you ever work for Bank of America?

25   A.    No, sir.

1    Q.    Are you familiar with Bank of America's processes

2    in maintaining loans since 2011?

3    A.    No, sir.

4    Q.    Do you have the complete file on this loan with

5    you?

6    A.    Not with me, no, we don't, no, I don't.

7    Q.    But you've reviewed it.

8    A.    Yes, sir.

9    Q.    Isn't it a fact that it's a practice of the Bank

10   of America to give an accuracy disclaimer letter when

11   it transfers servicing?

12   A.    Give the letter to who, to --

13   Q.    Would be to Caliber in this particular case.

14   A.    In -- I'm sorry, repeat the question.

15   Q.    Isn't it a fact that Bank of America gives an

16   accuracy disclaimer letter to in this case Caliber when

17   servicing of a loan is transferred?

18   A.    I'm not sure.  I don't know.

19   Q.    You have no way of knowing whether the

20   information that was transferred from Bank of America

21   to Caliber was accurate; is that correct?

22   A.    No, I do know that.  It would have not been

23   boarded into our system if the accuracy was -- would

24   have not been a hundred percent by ourselves in

25   acquisition department.

1    Q.     And the people who do that checking, do they do

2    it in conjunction with Bank of America?

3    A.     Yes, they do.

4    Q.     And they're different people from the ones who

5    are making the mistakes on the interest amounts that we

6    did?

7    A.     I never said that there was a mistake on the

8    interest.  I just said I wasn't able to explain to you

9    the difference in the interest.

10   Q.     What about Seterus, do you know how Seterus

11   maintains their records?

12   A.     No, sir.

13   Q.     When Caliber took over the loan from Bank of

14   America, did it also review the Seterus period of time,

15   which I'll represent was only a couple of months, at

16   the time they took the loan over?

17   A.     It is part of our business records to make sure

18   that all the information transferred and boarded into

19   our system is accurate.

20   Q.     All right.  In that process would Caliber have

21   noticed that the per diem number was different on the

22   Seterus loan than it is -- excuse me, the loan Seterus

23   was servicing and this particular loan?

24   A.     I have not seen that it was different, I have not

25   admitted that it was different, so I really don't

1    understand the question.

2    Q.    Ms. Lopez, I'm going to show you a series of

3    documents that have been -- actually, the judge should

4    have this, I suppose.

5            THE COURT:  Right.  It's not admitted?

6            MR. CLIFFORD:  Not admitted.

7            THE COURT:  Why don't you get it admitted and

8    I'll take a look at it.

9    BY MR. CLIFFORD:

10   Q.    I'm going to show you what's been marked for

11   identification as Defendant's Exhibit No. 2.  It's

12   three letters from Seterus to Jones.  Ask you to take a

13   look at that.

14   A.    Okay.

15   Q.    And please note the prior servicer's loan number.

16   Fair to say that the first one is a pretty standard

17   RESPA transfer of servicing notice?

18   A.    Yes, sir.

19   Q.    And this was giving notice to Jones that the loan

20   that had a servicer number of 159427709, which if you

21   look at the spreadsheets you'll see is the Bank of

22   America loan, was transferred to Seterus; is that

23   correct?

24   A.    Yes.

25   Q.    And it was effective December 1, 2012.

```
 1    A.    Okay.

 2    Q.    Okay?  The next letter is a notice of default and

 3    right to cure letter.  This was a Fannie loan, correct?

 4    A.    I don't remember.  I'm not sure.

 5    Q.    The next letter is a notice of default and right

 6    to cure, and on the second page of that it gives a list

 7    of what needs to be paid to cure the entire debt,

 8    interestingly enough.  Take a look at the third item

 9    down.

10    A.    I did notice that.

11    Q.    And that's $23.46.

12    A.    Yes, sir.

13    Q.    The per diem.

14          MR. DOONAN:  I'm going to object, Your Honor.

15    I don't believe this document has been admitted into

16    evidence.

17          THE COURT:  It hasn't.

18          MR. CLIFFORD:  It hasn't, I haven't moved its

19    admission yet, Judge.

20          MR. DOONAN:  I don't think there can be

21    testimony about what the document says.

22          MR. CLIFFORD:  Your Honor, I want to move

23    this, it's a standard -- she's testified a standard

24    RESPA package on a loan transfer, to the point that

25    she's able to testify that this is the Bank of America
```

1    loan that was transferred to Seterus, just a little

2    later on, I think effective February 1, it was

3    transferred back to Bank of America, which is how

4    ultimately Caliber ended up with it.

5           MR. DOONAN:  I don't believe, Your Honor, that

6    this witness can provide the foundation for this

7    document.  If Ms. Jones was here and could testify to

8    having received these documents from Seterus, then a

9    foundation could be laid.  But I don't believe that

10   this witness can lay the correct foundation for these

11   documents.

12          MR. CLIFFORD:  I can have her here, Your

13   Honor, if you would like.  They're at the end of a cell

14   phone call in a coffee shop somewhere nearby, I'm told.

15          THE COURT:  Well, what struck me is that she

16   first said that it is a standard RESPA set of documents

17   and second that the loan number for the Bank of America

18   is the same loan number on the Caliber documents.  I

19   think that's sufficient to get it in evidence.  And I'm

20   going to overrule your objection and allow it into

21   evidence.

22          MR. DOONAN:  Thank you, Your Honor.

23          MR. CLIFFORD:  Thank you, Your Honor.

24   BY MR. CLIFFORD:

25   Q.   So we'll get back to this per diem at $23.46,

```
 1   which of course is different from what Caliber says the

 2   per diem is.  Do you know if either of these are wrong?

 3   A.    I don't have any reason to doubt that the per

 4   diem in Caliber is wrong.

 5   Q.    That necessarily means the one in Seterus would

 6   be wrong, correct?

 7   A.    I mean, again, I am going to go with what -- I

 8   work for Caliber, I believe that Caliber does its job

 9   in accuracy, and I don't believe that it's wrong.

10   Q.    The accurate work that Seterus has allows that

11   per diem to be multiplied, that per diem that ends in

12   an even number, to be multiplied out and come out

13   with --

14   A.    You've asked that question already.

15   Q.    But there is a difference; isn't there?

16   A.    Yes, there is.

17   Q.    Do you know anything about Seterus, just --

18   A.    I do not.

19   Q.    You don't.

20         MR. CLIFFORD:  Your Honor, I've got no further

21   voir dire with this particular witness, and I renew my

22   objection.  These numbers are inherently unreliable.

23         THE COURT:  All right.  I think that goes to

24   the weight that the exhibit should be given, not to its

25   admissibility.  I'm going to admit the exhibit over
```

1    your objection.

2              MR. CLIFFORD:  Thank you, Your Honor.

3              THE COURT:  Mr. Doonan?

4              MR. DOONAN:  Thank you, Your Honor.

5                    CONTINUED DIRECT EXAMINATION

6    BY MR. DOONAN:

7    Q.    If someone is paying their mortgage on time, does

8    their per diem change?  Let me ask it a different way,

9    a clearer way.

10             If you have two loans and one has a principal

11   balance of 150,000 and one has a principal balance of

12   100,000, would they have the same per diem?

13   A.    No, and that's what I was trying to explain

14   earlier, but then I got nervous and confused.  And I

15   just right now for some reason cannot think clearly

16   with the per diem.

17   Q.    There are different components -- well, let's go

18   to something else, then.

19             When we look at Exhibit 3, and specifically

20   Section 3(B), this is the loan modification agreement,

21   correct?

22   A.    Yes.

23   Q.    And it lists a particular principal balance; is

24   that correct?

25   A.    That is correct.

1   Q.    And that principal balance is $159,019.35?

2   A.    That is correct.

3   Q.    And if we look at the payment history and we look

4   at the payment history for that date, the date of the

5   loan modification, do the numbers match?  Do the

6   principal balances match?

7   A.    Yes, sir.

8   Q.    So on 7/1/2011 the principal balance is the same,

9   $159,019.35?

10  A.    That is correct.

11  Q.    And the rest of the payment history shows some

12  payments being made?

13  A.    Yes, sir.

14  Q.    To the best of your knowledge has Caliber ever

15  received any letter from Ms. Jones saying that there

16  was a failure to credit her on any payments?

17  A.    No, sir.

18  Q.    And is it your testimony that all of the payments

19  made by Ms. Jones have been credited and reflected in

20  this payment history?

21  A.    That is correct.

22  Q.    And that the payment history is true and

23  accurate, especially as to the principal balance?

24  A.    Yes, sir.

25  Q.    Let's go over to Exhibit 7.  You were asked

1    earlier about odd numbers and even numbers and whether

2    you could get from one to another.  In looking at the

3    second page, the one entitled notice of right to cure,

4    you see that it's got a total monthly payments due for

5    46 months?

6    A.    Yes, sir.

7    Q.    And it's got a figure of $60,219.06?

8    A.    Yes, sir.

9    Q.    And then it's got three figures underneath it,

10   not two figures.  It's got three figures, correct?

11   A.    That is correct.

12   Q.    And just to make this as easy as possible for me

13   because I was a theater major, not a math major, if we

14   added up simply the pennies of those three numbers,

15   that adds up to 16, correct?

16   A.    That is correct.

17   Q.    And the last digit there is obviously six?

18   A.    That is correct.

19   Q.    And that matches the total monthly payments due

20   cents figure.

21   A.    That is correct.

22   Q.    Exactly.

23   A.    Yes, sir.

24   Q.    As Ms. Jones paid down her mortgage --

25   A.    No, sir.

1    Q.    No, no, no, as she did, when she was making

2    payments.

3    A.    Oh, yes, sir.

4    Q.    And each payment would reduce the principal

5    amount; is that correct?

6    A.    That is correct.

7    Q.    And because -- but the interest rate would stay

8    the same.

9    A.    That is correct.

10   Q.    So with the principal balance reducing, the per

11   diem would change each month; is that correct?

12   A.    That is correct.

13   Q.    And would that be a reasonable explanation for

14   there being different per diems at different times?

15   A.    Yes, sir.

16         MR. DOONAN:  Your Honor, my final exhibit is

17   Exhibit 9, and I just want to be clear that that has

18   been admitted into evidence because, although Ms. Jones

19   may be in a coffee shop nearby, she is not here in the

20   courtroom.

21         MR. CLIFFORD:  And I have, again, no objection

22   to the admission of Exhibit 9, Your Honor.

23         THE COURT:  Has 9 been admitted earlier?

24         THE CLERK:  It has not up to this point.

25         THE COURT:  The Court admits Plaintiff's

1    Exhibit No. 9 without objection.

2           MR. DOONAN:  Unless Your Honor has any further

3    questions for my witness, the plaintiff would rest.

4           THE COURT:  Well, I don't think -- I don't

5    think Mr. Clifford has done a cross-examination yet,

6    he's done a voir dire, so you don't want to rest

7    quite --

8           MR. DOONAN:  I don't want to rest quite yet.

9           THE COURT:  All right, Mr. Clifford?

10          MR. DOONAN:  Your Honor is correct, thank you.

11          MR. CLIFFORD:  Thank you, Your Honor.

12                    CROSS-EXAMINATION

13   BY MR. CLIFFORD:

14   Q.    Ms. Lopez, your discussion with Mr. Doonan seemed

15   to be leading towards the proposition that if a

16   mortgagor makes regular payments on a mortgage, 30-year

17   piece of paper, principal and interest, it's a fixed

18   payment every month, that as the principal goes down

19   the per diem changes?

20   A.    Yes, sir.

21   Q.    Does the monthly payment change?

22   A.    No, sir, but what changes is the way that it's

23   being distributed, more money's going to be distributed

24   towards the principal and less towards the interest.

25   Q.    Absolutely.  And if the payment every month is

1   the same payment until the last month of the loan, how

2   does that change the per diem?  Doesn't in fact the per

3   diem stay the same from day one on a loan to the last

4   day when it's paid off 30 years later?

5   A.    I don't know how it's calculated, but I do know,

6   and earlier I started saying that and I retracted

7   myself, that the per diem does change based on the

8   principal balance.  I don't know how it's calculated,

9   but I have seen that happen before.

10  Q.    Have you seen it happen after there's been a loan

11  mod?  Was that when it would happen?

12  A.    It depends on the type of modification.  If there

13  is a principal reduction then it would -- the per diem

14  would change.

15  Q.    There wasn't one in this case; was there?

16  A.    There was --

17  Q.    A principal change.

18  A.    There was a principal reduction.

19  Q.    You also testified that somehow or other the

20  taxes and insurance component of the payment as shown

21  on Exhibit 7, that that's subject to the interest rate

22  on the loan; is that correct?

23  A.    I'm sorry, what was the question?

24  Q.    Mr. Doonan had you total up the cents at the end

25  of the line items for principal, interest, taxes, and

1    insurance, the escrow.

2    A.    Yes, sir.

3    Q.    And you added those up, you come up with an even

4    number at the end.

5    A.    Yes, sir.

6    Q.    Okay.  Do you believe that that explains how

7    using a per diem with a -- with a -- ending in a

8    positive number or an even number, rather, that you can

9    come up with a negative number for accrued principal

10   and interest payments?

11   A.    I am not an expert in mathematics, so all of

12   these questions in reference to adding even and odd

13   numbers, I'm sorry, I cannot.  He asked me to add the

14   last three numbers and I added them and they ended --

15   and the answer is six.

16   Q.    On Exhibit -- Defendant's Exhibit 1, there are

17   numbers there with the per diems.  They all come out

18   to -- or accrued, excuse me, the interest calculations

19   come out to negative numbers -- excuse me, odd numbers.

20   Did those numbers that we talked about, interest

21   calculation line one, interest calculation line two,

22   did those numbers include taxes and insurance?

23   A.    No, these lines are strictly interest.

24   Q.    Okay.  Do you believe that the per diem number

25   includes taxes and insurance payments in the escrow?

1    A.    The per diem does not include taxes and

2    insurance.

3    Q.    Thank you.

4          MR. CLIFFORD:   I have nothing further of this

5    witness, Your Honor.

6          THE COURT:   Thank you.  Mr. Doonan?

7          MR. DOONAN:   Nothing further, Your Honor.

8          THE COURT:   You may stand down, ma'am.

9          THE WITNESS:   Thank you.

10         THE COURT:   Next witness?

11         MR. DOONAN:   Now the plaintiff rests, Your

12   Honor.

13         THE COURT:   Plaintiff rests.  Mr. Clifford?

14         MR. CLIFFORD:   We rest, Your Honor.

15         THE COURT:   Defense rests.  How do you

16   gentlemen wish to proceed?

17         MR. CLIFFORD:   Well, John suggested we brief

18   it.  That may not be the worst idea that the two of us

19   have come up with over the years.

20         THE COURT:   Right.  I think it would be

21   helpful to have it briefed.  One question I did have

22   a -- I did have on this.

23         First, I want to be sure that the exhibits that

24   have been referenced and admitted are actually given to

25   the clerk.  I had when I came in here a new book with a

1   different Exhibit 8, and I think I gave my book back to

2   you so that you could compare it, but the original

3   Exhibit 8 has disappeared.

4          MR. CLIFFORD:  You're right, there's no

5   original Exhibit 8 in there.

6          MR. DOONAN:  The original Exhibit 8 is now

7   Defendant's 1.

8          THE COURT:  Is now Defendant's 1?

9          MR. CLIFFORD:  Right.

10         THE COURT:  And do you have that?

11         THE CLERK:  I don't have it at this point.

12         THE COURT:  Okay.  At the end when we -- when

13   we leave, I want to be sure that you talk to the clerk

14   and make certain that these exhibits which seem to have

15   floated around a little bit get properly placed before

16   the Court.

17         MR. CLIFFORD:  Did you have them, Ms. Lopez,

18   up there, Defendant's 1?

19         MR. DOONAN:  We will figure that out, Your

20   Honor.

21         MR. CLIFFORD:  We'll get it.

22         MS. LOPEZ:  Oh, I do.

23         THE COURT:  Okay, you'll figure that out.  One

24   question I had was whether there is, either in the

25   policy or by law, an accepted definition of per diem

1    and how it's calculated.

2           MR. DOONAN:  We can find out, Your Honor.  I

3    believe that the -- a per diem is a function of the

4    amount owed and the interest rate.

5           MR. CLIFFORD:  And I agree except I think it

6    goes over 30 years for each discrete period of time,

7    until you're making your last payment.  I found that

8    out because we just paid ours off and --

9           THE COURT:  Congratulations, Mr. Clifford.

10          MR. CLIFFORD:  A nice, happy day.

11          THE COURT:  Well, it may be defined in the

12   policy somewhere; it may be defined as a matter of law.

13   There are different per diems that are already before

14   the Court as a matter of evidence, and Mr. Clifford's

15   raised a question as to whether or not that's accurate.

16   One question obviously I have is whether the per diem

17   is based purely on principal or whether the bank has

18   been adding interest, in other words, it's

19   collecting -- it's added the interest that has not been

20   paid on the per diem.

21          MR. DOONAN:  I would be shocked if that was

22   the case, Your Honor.  That sounds to me like double

23   billing.

24          THE COURT:  Yeah, it does to me, too.  But it

25   seems like the difference between the per diems is an

1   unexplainable gap.  Maybe you'll have an explanation

2   for it.  So, Mr. Doonan, do you want to take the first

3   stab at this?  It's your burden.  And then I assume

4   that Mr. Clifford will respond.  This may be a

5   situation where actually, now that I think of it, why

6   don't you think about this to see if we can expedite

7   it.  Why don't you both file at the same time and then

8   you can both respond at the same time.  And if I think

9   I need further information I'll let you know.  But

10  you've -- you are -- yours would probably I'm going to

11  guess be fairly succinct, and then Mr. Clifford will

12  raise some issues and you'll have an opportunity to

13  respond to that, and Mr. Clifford will have an

14  opportunity to respond to yours.  Then if you feel

15  there's something in the responses that's necessary for

16  further written argument, you can do so.

17       When do you -- assuming we do that, you both file

18  at the same time, when would you like to file?

19            MR. DOONAN:  30 days, Your Honor.

20            THE COURT:  30 days, which brings us to --

21            MR. DOONAN:  December --

22            THE CLERK:  December 6.

23            MR. CLIFFORD:  The day before Pearl Harbor

24  Day.

25            THE COURT:  So December 7.

1          MR. CLIFFORD:  Even better, Your Honor.

2          THE COURT:  And then when would you like to

3     respond?

4          MR. CLIFFORD:  Can we go 30 days after that?

5     Both Brother Doonan and I are going to be off at least

6     part of that month so --

7          THE COURT:  Any problem?

8          MR. DOONAN:  Actually if we could go 40 days

9     that would be helpful.

10         MR. CLIFFORD:  That would even be better.

11         THE COURT:  Okay.

12         THE CLERK:  January 16th.

13         THE COURT:  January 16, 2018, will be the due

14     date for the responses.  And I'll consider it closed

15     unless I get some indication from counsel that you wish

16     to file something in addition.  Anything further?

17         MR. DOONAN:  No, Your Honor.

18         MR. CLIFFORD:  No, Your Honor.

19         THE COURT:  Thank you very much, Mr. Doonan,

20     Mr. Clifford, as always.  Court will stand in recess.

21              (Time noted:  11:41 a.m.)

22

23

24

25

1

2                    **C E R T I F I C A T I O N**

3    I, Lori D. Dunbar, Registered Merit Reporter, Certified

4    Realtime Reporter, and Official Court Reporter for the

5    United States District Court, District of Maine,

6    certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8    Dated:   November 27, 2017

9                    /s/ Lori D. Dunbar

10                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25