UNITED STATES DISTRICT COURT

DISTRICT OF MAINE


U.S. Bank Trust, N.A., as Trustee for
LSF9 Master Participation Trust


                  Plaintiff


V.                                              CIVIL ACTION NO. 2:16-cv-00617-JAW


Julia L. Jones
                    Defendant

**DEFENDANT'S POST TRIAL MEMORANDUM**

      NOW COMES Defendant, by and through her undersigned attorney and submits her post trial memorandum at the specific direction of the Court.

**ISSUES**

      1, Did Plaintiff's Notice of Default and Right to Cure (Plaintiff's Ex. 7) conform to the requirements of 14 M.R.S. 6111?

      2. Was Plaintiff's Ex. 8 properly admitted into evidence and if so, did Plaintiff establish the amount due under the Note (Plaintiff's Ex. 1) and Mortgage (Plaintiff's Ex. 2)?

**ARGUMENT**

      Plaintiff's Notice of Default and Right to Cure Letter is defective and, as a consequence, under Maine Law Judgment must be entered against the Plaintiff and for the Defendant. To successfully prosecute a complaint for foreclosure, the Plaintiff must prove "the eight elements

1

of proof to support a judgment of foreclosure". *Bank of America, N.A. v. Greenleaf*, 2014 ME 89, ¶ 18, 96A.3d 700.  Among the eight elements of proof is "evidence of properly served notice of default and mortgagor's right to cure in compliance with statutory requirements[.]"  *Id*. And, the Law Court has given a "clear directive that foreclosure plaintiffs must strictly comply with all statutory foreclosure requirements".  *Id*.  The Notice of Default sent by the servicer Caliber to the Defendant on August 3, 2016 does not comply with 14 M.R.S. §6111 for several reasons. First, §6111 requires that the notice be sent by the mortgagee. Here, the notice was sent by the servicer, an entity precisely defined by the mortgage (Plaintiff's Ex. 2) at §20. The servicer is not the mortgagee. Were that not enough, the mortgage itself, at §22(b), requires that the notice be sent by the "lender"; again, not the servicer (*Citimortgage v. Chartier*, 2015 ME 17, 111 A.3d 39 (2015). The amount due as stated in the notice of default must be the precise amount that the mortgagor has 35 days to pay in order to cure the default, *Bank of America, N.A. v. Greenleaf*, at ¶ 31.  Therefore, any notice of default that instructs the mortgagor to pay more than the amount due as of the date of the notice does not comply with the statute. Here that is precisely what the notice demands. The notice contains a demand for $2638.32 in a "Corporate Advance Balance". As was established in the trial, that amount is virtually identical to the amount of attorney's fees and costs expended by the Plaintiff in 2015 and 2016 (Plaintiff's Ex. 8). Although Caliber's witness Lopez did not know the nature of the work counsel had performed, it was established through reference to Plaintiff's Ex. 6 that the fees were for a DJ action brought by Plaintiff to clean up a title problem caused by one or more defective "assignments" of the mortgage. A review of the mortgage showed that there are three instances when the mortgagee can charge the mortgagor with its attorney's fees. None applied in the case[1]. (Doc. 33, ppg. 21-26; Ex. 2 §9).

---

[1] At trial Plaintiff's counsel tried to argue that as Defendant was in default at the time of the DJ action, it was appropriate for Plaintiff to charge its attorney's fees, apparently for anything, to Defendant. The section in question,

Under the circumstances, Plaintiff's Ex. 7 demands more money for a cure than Plaintiff was entitled to. Because the notice was not sent by the mortgagee/lender and demands more money than Plaintiff was entitled to, it does not strictly comply with the statute and Plaintiff has failed to prove an element of its case for foreclosure.

Plaintiff's Ex. 8 was not properly admitted into evidence or, alternatively, it should be accorded no weight. Initially, it must be noted that quite literally all of Letycia Lopez's testimony about the "boarding" of the Jones' loan at Caliber must be disregarded and stricken as nothing more than hearsay. As Ms. Lopez testified, she started working at Caliber, the servicer, in December of 2015, previous to which she worked at Ocwen (Doc. 32, pg.6, lines 18-19). The boarding of the Jones loan by Caliber took place on November 11, 2014, more than a year before Lopez went to work at Caliber (Defendant's Ex. 1; Doc. 33, pg. 28 lines 23-25, pg. 29 lines 1-4). Lopez testified at length about the processes Caliber has used to assure accuracy in its loan boarding since her arrival, but she never gave any evidence as to what the Caliber boarding process was prior to her employment there.[2] She didn't even testify that some unnamed person or persons at Caliber told her or demonstrated to her what those processes were. This Court has no admissible testimony before it from which it can conclude that the November 2014 Caliber loan boarding process was accurate and produced reliable results. As such, Ms. Lopez's boarding testimony should be disregarded and Defendant's objection to Plaintiff's Ex. 8 sustained.

Early on in the second day of trial, Plaintiff's counsel presented Ms. Lopez with what had been marked as Plaintiff's Ex. 8 (Doc. 33, pg. 4), previous to which he had set up a "chalk" of

---

§9(a), applies to actions arising out of the mortgagor's default such as a foreclosure action or a HAMP modification, not out of the creation and correction of a title flaw because lenders from away don't understand Maine real estate law.
[2] Of course, she couldn't, any more than she could testify about Bank of America's policies (Doc. 33, pgs.37-38, lines 24-25 &1-3) or Seterus' practices (Doc. 33, pg.39 lines 10-12).

Plaintiff's Ex. 8 (Doc.33, pg. 3-4.).  Later on in the trial, Defendant's counsel questioned Ms. Lopez about the blacking out of the prior servicer's account number on Plaintiff's Ex. 8. (Doc. 33, pg. 9 lines 22-25). When asked if she had blacked out that number, she replied that she had not. When asked who did, she replied "The person that provided to Mr. Doonan" (sic) (Doc. 33, pg. 10, lines 2-9). She went on to describe the process through which some unnamed person went to produce Ex. 8 and provide it to Attorney Doonan (Doc. 33, pg. 10, lines 11-13). Ex. 8 is plainly a printout of electronically stored information. As such, pursuant F.R. Evid. 1001(d), before the document could be admitted, there had to be testimony that the document accurately reflected the electronic information it purported to demonstrate. While Ms. Lopez went on at some length about how many times she had used the "LPS" system and that she had never noticed any variance between a document she printed from the system and what the system showed on her computer screen (Doc. 33, pgs. 10-12), there was no testimony that Plaintiff's Ex. 8 had ever been compared by anyone with the electronically stored information, for example on a computer screen, it supposedly represented. In fact, Plaintiff's Ex. 8 most certainly was not a faithful representation of what Caliber had stored in its computer system since the Lopez testified that it had been altered by some unnamed person who then delivered it to Attorney Doonan. Since there was no testimony as to the faithfulness of Plaintiff's Ex. 8 to the electronic original, it does not meet the standard set forth in F.R. Evid. 1001(d) and so should be disregarded.

F.R. Evid. 901(9) requires that in order to authenticate Plaintiff's Ex. 8, Plaintiff was required to establish by evidence that Caliber's computer system produced an accurate result. There was no such testimony from Ms. Lopez and in any event, as the transcript of the trial amply demonstrates, the Caliber system does not produce accurate results. For example, the Caliber system produced the figures for what the bank asserts is its 14 M.R.S. 6111 Notice of

4

Default and Right to Cure, Plaintiff's Ex. 7. In that letter, Caliber claims that the total late charges on the account are $432.81 for the 30 months the note had been in default up to the late charge cutoff date of June 17, 2015[3]. But on Defendant's Ex. 1, Caliber claims that the late charges for the exact same period of time are $1442.70! Where that not enough, Plaintiff's Ex. 8 shows that there are *no late charges due* for the relevant period of time. When questioned as to why there was such a discrepancy between the late charge figures, Ms. Lopez opined that perhaps that difference was why Caliber was no longer seeking any late charges[4] (Doc. 33, pg. 19, lines 7-12). Perhaps Caliber recognized the error of its own system!

The errors in Caliber numbers multiplied as Ms. Lopez continued her testimony. For example, the Seterus December 16, 2012 Notice of Default and Right to Cure letter which is contained in Defendant's Ex. 2 shows the per diem[5] for the loan as $23.46. But Plaintiff's Ex. 8 and Defendant's Ex. 1 show the per diem as being $23.42. A review of the account spreadsheets as shown on Defendant's Ex. 1 and Plaintiff's Ex. 8 show that there were no regular payments of principal and interest made between the Seterus Notice of Default and the dates of Defendant's Ex. 1 and Plaintiff's Ex. 8. The Plaintiff's witness could not explain the discrepancy save to say that she works for Caliber and doesn't believe that its calculation is wrong (Doc. 33, ppg. 42-43,

---

[3] This date is noted on Defendant's Ex. 1 and Plaintiff's Ex. 8.

[4] Lopez had earlier testified that the change in the late charge figures between Plaintiff's original Ex. 8, now Defendant's Ex. 1, and the final Plaintiff's Ex. 8 was due to a "change in policy" (Doc 33, pg. 17, lines 2-6). Lopez incongruously claimed that the change in the numerical designation of "Investor" between the October and November Account Summaries (Defendant's Ex. 1 & Plaintiff's Ex. 8) didn't really mean a change in investors but rather a "change in policy" (Doc. 33, ppg. 16 & 17, lines 17-25, 1-6).

[5] Legal definition of "Per Diem", adj. "Paid or calculated by the day; *per diem* interest." "Per Diem" *Merriam-Webster.com*. Merriam-Webster, n.d. Web. 4 Dec. 2017. In this case, the per diem figure shown on the Account Summary was interest only, as can be demonstrated by calculating the interest for one day using the note rate x the principal balance of the loan and dividing by 365. It appears that what Caliber did was divide by 360. That will result in the numbers shown for "Interest Calc Line 2" (but not for "Interest Calc Line 3") and that per diem, $23.74, is different from that called for in the Account Summary. Note that the Promissory Note, Plaintiff's Ex. 1, does not mandate a 360 day year.

lines 25, 1-9).

The interest calculations shown on the Account Summary contained in Defendant's Ex. 1 are mathematically incorrect.  The Summary states that the principal balance of the loan as of October 2017 was $155,409.02, a number which was unchanged from November 1, 2012 to the date of the trial.[6] The interest rate on the Note as amended by the HAMP modification (Plaintiff's Ex. 3) was 5.500%. "Interest Calc Line 2" shows interest due for the period 09/01/17 to 10/01/17 as $712.29. In point of fact, at $23.42 per day, the amount should be $702.60. The next line on the Summary, "Interest Calc Line 3" shows interest due for the period 10/01/17 to 10/13/17 as $281.01. In point of fact, at $23.42 per day, the amount should be $304.46 for 13 days or with a 12 day calculation, $281.04, not $281.01. The interest amounts due as shown on Defendant's Ex. 1 are also mathematically impossible. The per diem, $23.42, is an even number. Multiplying an even number by any number, odd or even, will always produce an even number. Neither of Caliber's interest calculations result in an even number, though the Defense's corrected calculations do.

The Court should consider whether or not loan history records presented by a servicer are in fact like regular business records. As has been briefed in the Maine Supreme Judicial Court in *Key Bank, NA v. Kilton, et al*, Law Docket # Yor-2017-198[7], they simply are not. The business records exception to the rule against hearsay evolved to address difficulties presented by the common law doctrine that parties were incompetent to testify as witnesses and the unavailability of a third party who could testify as to the accuracy of a business's books.  34 Am. Jur. Proof of Facts 2d 509 (1983).  The "shop-book" rule emerged to permit a shopkeeper with no clerks to

---

[6] See Doc. 1 ¶¶ 24 & 25
[7] The undersigned was counsel for the amicus MASH on the brief.

testify as to the accuracy of the books where the entries were made by the shopkeeper who swore to their accuracy or could verify their accuracy by the testimony of others who dealt with the shopkeeper. *Id.* The "regular entries" doctrine also emerged whereby the records of a bookkeeper who was unavailable to testify could be admitted if the entries were made by the bookkeeper "in the regular course of business, under circumstances calculated to insure accuracy and precluding any motive of misrepresentation." *Id.* These rules expanded to reflect the realities of large corporations, and were eventually codified into relatively uniform rules. Sidney Kwestel, *The Business Records Exception to the Hearsay Rule – New is Not Necessarily Better*, 64 Mo. L. Rev. 595, 595-96 (1999). In 1975, the U.S. Congress passed the Federal Rules of Evidence, which incorporated the business records exception at Rule 803(6). Maine incorporated a similar Rule 803(6). While the business records exception evolved with the modernization of bookkeeping practices, its justification has always been the inherent reliability of the records kept by businesses. *See* Fed. R. Evid. 803 Advisory Note on Exception (6) ("[T]he element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."); 30B Fed. Prac. & Proc. Evid. § 6862 (2017 ed.) ("[T]he hearsay exception relies on the inherent incentive that organizations have to keep accurate records.")

Since the codification of the business records exception in Rules of Evidence across the country, its application has tended to become an exercise in rote recitations of the elements of the rule without any critical analysis. As one scholar noted:

> [C]ourts are rarely careful or analytical when dealing with the business records exception. They seem to gloss over difficulties that would arise from a more faithful application of the exception's requirements and intuitively admit documents they deem trustworthy. They do not appear hampered by particular codified language.

> As a result, courts have injected a degree of confusion into an area that should be relatively clear.

Kwestel, 64 Mo. L. Rev. at 601-02.  The potential harm from a cursory analysis of the 803(6) elements are compounded when the party offering the records did not actually create those records, but rather, as here, received them from a separate entity.  The receiving business's witness typically has no knowledge of the transmitting entity's recordkeeping practices, as Caliber's witness here admitted (Doc 33, pg. 38, lines 1-3).  Such a witness, therefore, is incapable of making a prima facie foundational showing under the business records exception.

To resolve this critical defect, witnesses will offer evidence that the receiving entity "integrated" the records and "relied" on them in its operation.  This showing of "integration" is also susceptible to superficial affirmations by witnesses, but more importantly often falls far short of establishing the trustworthiness of the records required in the rule.

> General statements that a document is admissible if a witness testifies that R[eceiver] integrated the document into its files and relied on it are not very helpful. They substitute clichés for analysis. The requirements for admissibility under 803(6) or any other business records exception for a written record of [Sender] received by R[eceiver] should be no different from the requirements for any other document. The question that must be answered in all cases is: Has the proponent established each of the foundation requirements for admissibility?

Kwestel, 64 Mo. L. Rev. at 645.  If a record was created and maintained by the transmitting entity in such a manner that it may be admitted under Rule 803(6), then the receiving entity must offer credible evidence of the sending business's recordkeeping practice for Rule 803(6) to have any force. *See id.* ("If the proponent offers the document as S[ender]'s business record . . . the proponent must show that S[ender]'s document satisfies each of the foundation requirements of the applicable business records exception.  If the proponent fails to do so, the document should not be admitted as S[ender]'s business record.")  Here, Caliber became the servicer of the loan and "boarded" the data of the prior servicers in November, 2014 (Doc. 33, ppg. 28-29, lines 23-25, 1-

4). All of the data contained in the spreadsheets attached to Defendant's Ex. 1 and Plaintiff's Ex. 8 prior to November 2014 come from prior servicers, Countrywide, Bank of America Home Loans, Seterus and Bank of America. Where the receiving entity offers its own record that is based upon the records of a different business, the simple fact that it has "integrated" the record and now relies on it in operating its business satisfies none of the elements of the rule. *See id* ("If, however, the document is offered as R[eceiver]'s business record, it should not be admissible if the proponent only shows that R[eceiver] received and filed it, nor should the document be admissible if R[eceiver] integrated into its records if integration means only that R[eceiver] relied on it."). As the record reflects, Plaintiff offered no testimony from any employee of the prior servicers to establish the reliability of the records upon which Caliber purports to rely. The Rules do offer proponents of such data an alternative process of admission, Fed. R. Evid. 902(11). Plaintiff chose not to avail itself of that method.[8]

Defendant has established that Plaintiff has not laid a proper foundation for the admission of any of the records of the three prior servicers of this loan. Consequently, Plaintiff's Ex. 8 is nothing more than hearsay. Defendant has also established that the Plaintiff/Caliber's own figures for the period it has serviced the loan are unreliable. The Account Summaries and Notice of Default and Right to Cure Letter are riddled with inconsistencies and mathematical errors. This Court should accord those numbers no weight whatsoever.

In Maine Law, there are "eight elements of proof to support a judgment of foreclosure". *Bank of America, N.A. v. Greenleaf et al.*, 2014 ME 89, ¶ 18, 96 A.3d 700. They are:

1. the existence of the mortgage, including the book and page number of the mortgage, and an adequate description of the mortgaged premises, including the street address, if any;

---

[8] One wonders why it didn't. Neither the undersigned, nor any member of his firm has ever seen a servicer attempt to get loan records admitted through the use of either the Federal or State Evidence Rule 902(11).

2. properly presented proof of ownership of the mortgage note and evidence of the mortgage note and the mortgage, including all assignments and endorsements of the note and the mortgage.

3. a breach of condition of the mortgage;

4. the amount due on the mortgage note, including any reasonable attorney fees and court costs;

5. the order of priority and any amounts that may be due to other parties in interest, including public utility easements.

6. evidence of properly served notice of default and mortgagor's right to cure in compliance with statutory requirements;

7. after January 1, 2010, proof of completed mediation (or waiver or default of mediation), when required, pursuant to the statewide foreclosure mediation program rules; and

8. if the homeowner has not appeared in the proceeding, a statement, with a supporting affidavit, of whether or not the defendant is in military service in accordance with the Servicemembers Civil Relief Act.

*Greenleaf*, 2014 ME 89, ¶ 18, 96 A.3d at 708 (internal citations omitted).

In the present matter, Plaintiff has failed to prove elements 4 and 6. As a consequence, this Court should enter Judgment for the Defendant, award her reasonable attorney's fees and costs pursuant to 14 M.R.S. §6101 and direct that the mortgage be discharged of record, *Federal National Mortgage Association v. Deschaine*, 2017 ME 190 ¶37.

December 6, 2017

> /s/John D. Clifford, IV
> John D. Clifford, IV, Bar # 0146
> Clifford & Golden, P.A.
> P.O. Box 368
> 5 Maple Street
> Lisbon Falls, ME 04252

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2017, I served a copy of the foregoing Defendant's Post Trial Memorandum by ECF Notification to John A. Doonan, Esq., Doonan, Graves & Longoria, LLC 100 Cummings Center, Suite 225D Beverly, MA.  01951

> /s/John D. Clifford, IV
>
> John D, Clifford, IV